UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SARAH PESHEK, o/b/o N.R., | ) | CASE NO. 3:13CV1854 |
| | ) | |
| Plaintiff, | ) | JUDGE LESLEY WELLS |
| | ) | Magistrate Judge George J. Limbert |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN[1], | ) | |
| ACTING COMMISSIONER OF | ) | **REPORT & RECOMMENDATION** |
| OF SOCIAL SECURITY, | ) | **OF MAGISTRATE JUDGE** |
| | ) | |
| Defendant. | ) | |

Sarah Peshek ("Plaintiff"), acting on behalf of N.R., a minor ("Claimant") and Plaintiff's son, seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Commissioner of the Social Security Administration ("SSA"), denying Claimant's Supplemental Security Income ("SSI") claim.  ECF Dkt. #1.  Plaintiff asserts that the ALJ did not conduct a proper analysis at step three of the sequential analysis and improperly weighed the evidence. For the following reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and DISMISS the instant case with prejudice:

## I.    **PROCEDURAL HISTORY**

On December 30, 2009, Plaintiff, acting on behalf of Claimant, filed an application for children's SSI, alleging disability beginning October 30, 2008, due to Claimant's behavioral problems and difficulty with verbal communication. ECF Dkt. #13 ("Tr.") at 220-223.   The application was denied initially and on reconsideration.  *Id*. at 159-160.

Plaintiff filed a request for a hearing by an ALJ and on January 6, 2012, an ALJ conducted an administrative hearing *via* video conference, where Plaintiff and Claimant appeared and were represented by counsel.  Tr. at 50-96.  At the hearing, the ALJ accepted testimony from Claimant

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

and Plaintiff. *Id*. On February 24, 2012, the ALJ issued a Notice of Decision - Unfavorable. *Id*. at 27-49. Plaintiff requested review of the ALJ's decision to the Appeals Council, but on June 28, 2012, the Appeals Council denied Plaintiff's request for review. *Id*. at 1-6.

On August 22, 2013, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1. On February 11, 2014, Plaintiff filed a brief on the merits. ECF Dkt. #16. On April 11, 2014, with leave of Court, Defendant filed a brief on the merits. ECF Dkt. #19. Plaintiff filed a reply brief on April 24, 2014. ECF Dkt. #20.

**II**.     **RELEVANT MEDICAL/SCHOOL HISTORY**

   **A.     Hearing testimony**

At the hearing, Plaintiff testified that Claimant, who was four years of age, attends a special education class reserved for individuals with two or more disabilities. Although Claimant was one of only eight students in the class, he was unable to advance to kindergarten that year because he was required to repeat pre-school. Tr. at 54, 74.

At the hearing, Plaintiff testified that Claimant throws himself on the floor and hits his head against the wall when he is frustrated. He also punches and bites himself. Tr. at 68. At the hearing, Claimant's arms and legs were exposed in order to show various bruises and scars from past misbehavior. Tr. at 66-67. Claimant's parents had to "safety-proof" their home in order to prevent Claimant from hurting himself. Tr. at 87. When Claimant is out in the yard, he runs into the street without warning. In fact, the Cuyahoga County Board of Disability erected a fence around Claimant's home to prevent him from running into the street. Tr. at 68-69, 87.

Plaintiff was told that Claimant would experience less frustration, and, therefore, be less likely to throw tantrums, after his communication skills improved through speech therapy. Plaintiff testified that, although Claimant has increased his vocabulary with speech therapy (from twenty-five to seventy-five words), his behavior has worsened. Tr. at 80, 84.

Claimant testified at the hearing *via* video conference, where the ALJ acknowledged that she "could barely understand anything [Claimant] said." Tr. at 64. However, in her Decision, the ALJ wrote that she was able to understand Claimant except when he turned his head away from the microphone. It is important to note that Claimant answered many of the ALJ's questions, but

several answers required prompting or further explanation of the question by Plaintiff. It is also important to note that Claimant provided one-word answers, for the most part, but also that the ALJ formulated questions that required "yes or no" answers.

In addition to Claimant's self-injurious behavior, Claimant often lashes out at his siblings and  classmates. He must wear a harness on the school bus in order to prevent him from hurting himself or other children.  Tr. at 70.   At home, he kicks his siblings, throws objects at them, and pulls their hair.  Tr. at 71. He tormented the family puppy, choking it and pulling its tail, until his parents felt they had no other choice but to give away the puppy. Tr. at 77.

Plaintiff testified that Claimant can sit still for ten minutes.  Tr. at 79.  He cannot read, and cannot eat at the table because he throws food. He rides his bike and plays video games, but often throws the game controller at the television screen when he becomes frustrated.  According to Plaintiff's testimony, Claimant throws approximately seven temper tantrums per day, lasting between thirty minutes and several hours.  Tr. at 83.  Claimant cannot be cared for by a babysitter and cannot be taken out in public because of his behavior.  Plaintiff testified that he fights "with everybody."  Tr. at 82.  Claimant likes to be alone, although he does have two children that he considers to be friends at day care.  Tr. at 85, 82.

At the time of the hearing, Claimant was prescribed Risperdal and Focalin.  Tr. at 77. When the ALJ asked Plaintiff about a notation in the treatment records indicating that she had run out of Risperdal at some point, she denied ever allowing the prescription to lapse, and further testified that Risperdal only ameliorated Claimant's symptoms when he first began taking it.  Tr. at 87. The ALJ also inquired about a notation in the record indicating that Plaintiff refused to employ behavior modification techniques recommended by Claimant's doctors. Plaintiff testified that she was reluctant to give Claimant " time outs," because he often injured himself when he was alone.  Tr. at 90-91.

     **B.**     <u>**Medical evidence**</u>

Claimant was born on October 26, 2007.  According to Plaintiff, he was fussy and hyperactive since birth.  Tr. at 266, 338. She reported that he was never able to sit still, he hurt

people by biting, hitting, and throwing things, and was not able to communicate like other kids. Tr. at 239.

At twelve months, Veronica Crowe-Carpenter, a nurse practitioner, noted concerns about Claimant's aggressive behavior and temper tantrums, which she witnessed during an office visit. In addition to exhibiting behavioral problems, Claimant also exhibited language delays. A referral to pediatric neurology was made to evaluate Claimant's aggression, delayed milestones, and behavioral issues. Tr. at 488, 496. He referred to Help Me Grow, a state-wide program that provides services to families to help children prepare to attend school. Tr. at 276-279.

Following an initial assessment, the agency worked with Plaintiff to obtain the services of a speech pathologist and to address the Claimant's behavior at daycare. Tr. at 288.  Claimant was referred to Beech Brook on April 21, 2009 by Help Me Grow because of his aggressive behavior, hyperactivity (including temper tantrums), and speech/language disorder.  Tr. at 519, 554.

Help Me Grow also referred Claimant to Parma Developmental Center for speech therapy, where he began working with a speech language pathologist, Kimberly Scott, SLP, on August 4, 2009. Tr. at 255.  Claimant was diagnosed with Broca's Dysphagia, a disorder characterized by an inability to produce language, that is, the child can understand words but can not use words to answer. Tr. at 794 , 883. At the time of his initial assessment, Claimant, who was twenty-one months old, had expressive language skills under twelve months and mainly communicated by crying, vocalizing and reaching for what he wanted confirming his mothers observations. Tr. at 289.

Claimant was evaluated by Elie Rizkala, M.D., a pediatric neurologist, on August 14, 2009. Tr. at 582.  Dr. Rizkala observed that Claimant was twenty-one months of age and that he had speech delay and episodes of tantrums.  Plaintiff reported that her other children suffered from Attention Deficit Hyperactivity Disorder ("ADHD"), and that they were on psychostimulants. Tr. at 582.  Plaintiff further reported that her sister has ADHD and her dad was bipolar.  Tr. at 581.

On January 29, 2010, Dr. Rizkala noted that clonidine provided temporary cessation of Claimant's behavioral outbursts and disruptive behavior. Tr. at 566. Dr. Rizkala acknowledged that Claimant became out of control when his morning dose of clonidine wore off, and that his school

teachers were not allowed to administer his noon dose of the medication.  At the time, Claimant was twenty-seven months of age.

On examination, Claimant appeared calm, held still, and established eye contact. Tr. at 567. He did not switch from one object to another. Tr. at 567. He focused when Dr. Rizkala asked him simple questions, and he answered the questions appropriately with only some disarticulation. Tr. at 567. Claimant could also make two-word sentences and was acquiring more vocabulary. Tr. at 567. He listened to and followed his mother's commands. Tr. at 567. Dr. Rizkala prescribed Guanfacine, which is longer acting that clonidine. Tr. at 567.

Roughly two months later, on March 17, 2010, Plaintiff discussed Claimant's behavior with Carol Sue White, Ph.D., a psychologist. Tr. at 690, 695. Plaintiff stated that Claimant screamed if he did not receive a bottle of milk at bedtime or when watching television. Tr. at 695. Plaintiff acknowledged that she gave in to Claimant when he did so because his father did not like the screaming. Tr.  at 695. She also said that she tried to show Claimant affection when he was upset, but it did not calm him. Tr. at 695. She had to "child-proof" her house due to his behavior. Tr. at 690.  She did not use "time-outs" due to ethical concerns. Tr. at 695.

On April 6, 2010, Claimant and his siblings returned to Dr. White for a behavioral and emotional assessment. Tr. at 711-713. When Dr. White asked Claimant to complete a puzzle, he commenced a thirty-minute long tantrum. Tr. at 712. During the tantrum, Dr. White asked Claimant's siblings and mother to leave the room. Tr. at 712. Dr. White remained with Claimant and explained that he had to complete the puzzle. Tr. at 712. "Eventually [Claimant] did and was rewarded with the presence of his mother." Tr. at 712. Dr. White noted that Claimant exhibited the ability to somewhat adapt to the behavioral demands of his environment and successfully completed the tasks at hand Tr. at 701. She also concluded that Claimant needed further implementation of behavioral techniques to learn to have his emotional needs met in a more positive way. Tr. at 701, 713. Dr. White opined that Claimant's mother reinforced his strong reactive attachment disorder by trying to placate him in public and at home. Tr. at 713.

Two weeks later, on April 19, 2010, Dr. White noted that although Claimant would be eligible for behavior and speech therapy in September of 2010, his mother would not allow him to

attend therapy until January of  2011 because she did not think he could be safe on the bus, even with a harness. Tr. at 724. The following month, on May 11, 2010, Ms. Scott  noted Claimant's decreased cooperation and mild tantrum, but acknowledged that he was tired. Tr. at 845.

On May 17, 2010, Dr. White observed Claimant as very wild and disruptive at the beginning of treatment, but noted that he improved greatly with the implementation of behavioral techniques. Tr. at 730. Plaintiff stated that she could leave Claimant with his father because Claimant was experiencing fewer "meltdowns." Tr. at 643. Plaintiff had also developed strategies to improve Claimant's compliance and behavioral responsiveness. Tr. at 643. For example, when she allowed Claimant to exercise in the yard for at least twenty to thirty minutes, he became more compliant and had fewer tantrums. Tr. at 643. In addition, when she did not pay attention to his negative behaviors, they were more likely to cease. Tr. at 730.

Ms. Scott observed on July 19, 2010, that Claimant had shown "tremendous growth" because at the age of approximately three years, he was able to use or initiate a two or three words phrase while in the speech therapy sessions, although she acknowledged that he was still using gestures to express himself at home and at daycare. Tr. at 267-268.

On August 3, 2010, Claimant presented to Kamal-Neil S. Dass, D.O., regarding his behavior. Tr. at 879-881. Among other things, Plaintiff reported that he "ha[d] at least 1 to 3 tantrums per day at home, and they last[ed] about 5 minutes at a time." Tr. at 879. Claimant remained hyperactive and he fought with others, Tr. at 879, but his medication helped to calm and relax him. Tr. at 879. Claimant cooperated with Dr. Dass' examination. Tr. at 881. He also had good insight and judgment. Tr. at 881.

On December 30, 2010, Dr. Rizkala noted that Claimant's "agitation and restlessness improved dramatically" since he had been prescribed Risperdal.  Tr. at 794. Claimant had also made gains in his speech and could interact with his siblings and other children in the family. Tr. at 794. On examination, Claimant appeared to be in good spirits and had excellent eye contact. Tr. at 795. He whispered to his mother and followed commands when she encouraged him. Tr. at 795.

On January 17, 2011, Dr. Dass reported that, despite having three tantrums per week at his special education preschool, Tr. at 877, Claimant did well at daycare and at home. Tr. at 877.

-6-

Risperdal, which had been restarted in November due to increased aggression and severe tantrums, had been helpful. Tr. at 877. On examination, Claimant was cooperative; he had good insight and judgment. Tr. at 877.

Thereafter, on April 26, 2011, Dr. Dass noted that Claimant had been having tantrums and playing more aggressively since running out of Risperdal one month earlier. Tr. at 876. It was restarted. Tr. at 876. Nonetheless, Claimant cooperated with Dr. Dass' examination; he again had good insight and judgment. Tr. at 876.

Claimant returned to Dr. Dass on July 20, 2011, and was doing well in his special education preschool and "OK" at daycare. Tr. at 875. He was "OK" at home too, but he had been more oppositional and he continued to fight with his sister. Tr. at 875. On examination, Claimant was cooperative. Tr. at 875. He had good insight and judgment. Tr. at 875. Dr. Dass continued Claimant's prescription of Focalin and Risperdal. Tr. at 875. He diagnosed Claimant with ADHD, ODD, and rule-out separation anxiety disorder. Tr. at 38, 875.

### C.      Assessments and day-care provider questionnaires

On February 23, 2010, Ms. Scott documented Claimant's ability to initiate two-word phrases several times. Tr. at 888. She rated his receptive language skills as within range (i.e., up to 27 months). Tr. at 888. Claimant's expressive language skills were solid up to 18 months with emerging skills up to 21 months, which she acknowledged were out of range.  Tr. at 888. Subsequently, on October 5, 2010, Plaintiff discontinued Ms. Scott's services because Plaintiff could receive speech therapy through school. Tr. at 890. At her last visit with Claimant, Ms. Scott observed that he "spontaneously used words and phrases to communicate in the clinic room." Tr. at 890.

On December 30, 2010, Plaintiff informed Dr. Rizkala that Claimant "ha[d] been making gains in his speech . . ." Tr. at 794. Dr. Rizkala described Claimant as gaining speech skills through early intervention assistance provided by his school. Tr. at 796.

On August 15, 2011, Claimant reported to Mary Flood, CNP.  Plaintiff reported that he spoke in full sentences, although he was difficult to understand. Tr. at 829. She also reported that Claimant stuttered when he spoke quickly. Tr. at 829. Claimant had not received speech therapy during the summer and Plaintiff declined a speech therapy referral. Tr. at 829-30. She explained that Claimant's

-7-

father did not believe extra speech therapy outside of school was necessary. Tr. at 830. On examination, Claimant spoke in full sentences that were difficult to understand. Tr. at 830. He named body parts, drew a person with five parts, identified colors and shapes, and recognized some letters. Tr. at 830.

On May 25, 2010, Silvia Vasquez, M.D., a state agency physician, in collaboration with Cindy Matyi, Ph.D., and Karen Carver, M.A., C.C.C./S.L.P., reviewed Claimant's records and determined that his impairments (Reactive Attachment Disorder, Disruptive Behavior Disorder, and Expressive Language Disorder) did not meet, medically equal, or functionally equal an impairment identified in the Listings. Tr. at 629-634. Regarding functional equivalence, Dr. Vasquez determined that Claimant had no limitation in the domains of Moving About and Manipulating Objects, and Health and Physical Well Being. Tr. at 632. Additionally, she found him to have less-than-marked limitations in the domains of Acquiring and Using Information, Attending and Completing Tasks, and Caring for Yourself. Tr. at 631-632. She also opined that Claimant had a marked limitation in the domain of Interacting and Relating with Others. Tr. at 631.

Nearly four months later, on September 6, 2010, Malika Haque, M.D., another state agency physician, in collaboration with Bruce Goldsmith, Ph.D., and Melissa Hall, M.A., C.C.C./S.L.P., affirmed Dr. Vasquez's opinion. Tr. at 679-684.

On November 11, 2010, Veronica Crowe-Carpenter, RN, CPNP, completed a Functional Questionnaire Age 1-3 for Claimant. Tr. at 773-79. She opined that Claimant had marked and extreme difficulties in behavioral and developmental categories in each of the five domains. Tr. at 776-779. Ms. Crowe-Carpenter wrote, among other things, that Claimant was combative, Tr. at 774, and aggressive. Tr. at 775. He had difficulty adapting to change and appeared to be oblivious, Tr. at 776, He needed constant supervision. Tr. at 779.

Almost a year later, on September 14, 2011, Dr. Dass also completed a questionnaire to assess Claimant's functional abilities. Tr. at 35, 834-840. He acknowledged that he did not assess Claimant in the functional domains of Acquiring and Using Information, and Moving About and Manipulating Objects. Tr. at 835, 839. He further noted that Claimant had "no difficulties" in the

-8-

functional domain of Health and Physical Well-Being. Tr. at 840. In the remaining functional domains, i.e., Interacting and Relating with Others, Attending and Completing Tasks, and Caring for Yourself, Dr. Dass opined that Claimant had marked and extreme difficulties in every listed sub-category, with the exception of sub-categories upon which he had no evidence to observe, *i.e.*, able to concentrate on activities like assembling a puzzle, sleeps without disturbance, is willing to be consoled when sad . Tr. at 836-839.

On September 29, 2010, as part of an Individualized Education Program ("IEP") assessment, Claimant's school administered the Vineland Adaptive Behavior Scales, Second Edition ("Vineland-II"). Tr. at 38, 686-687. Despite some concern regarding domestic skills, Claimant displayed adequate daily living skills. Tr. at 687. He had lower-than-adequate expressive skills, and moderately low socialization skills. Tr. at 687. As for his cognitive skills, Claimant exhibited articulation problems, but achieved a verbal score of 101 (average). Tr. at 686. He earned a below-average non-verbal score, but that "was mainly due to his refusal to perform on the blocks test as he was preoccupied with his favorite toy at the time." Tr. at 686.

On October 25, 2010, Jillian Bachman, an employee at Claimant's daycare, completed a Functional Questionnaire Age 1-3 for Claimant. Tr. at 760-765. She opined that Claimant had marked difficulties in understanding and following simple instructions, enjoying simple rhymes, and songs, and developing improving skills in problem-solving, with respect to the domain of acquiring and using information. Tr. at 762. She further opined that Claimant had marked difficulties in receiving and giving affection, and offering toys to other without the expectation of them being returned, and extreme difficulties with respect to controlling aggressive behavior or intent to hurt others, and destruction of nearby objects when frustrated or angry, in the domain of interacting and relating to others. In the domain of attending and completing tasks, Ms. Bachman opined that Claimant had marked difficulties in his ability to change activities regularly, to look at picture books for long periods of time, to initiate and maintain concentration for brief periods, and to remain engaged in activities. Tr. at 763. She noted extreme limitations in Claimant's ability to filter out or ignore distractions and regain composure when he is startled. Finally, Ms. Bachman notes extreme difficulties when Claimant is separated from his parents, and marked difficulties with

tantrums when he is unable to express himself, his attachment to a toy or blanket, and in his need for attention from his care givers, in the domain of caring for himself. Tr .at 764.  In the domain of health and well-being, Ms. Bachman noted Claimant's marked inability to express himself. Tr. at 765.

On October 26, 2010, Tina Hayslip, another employee at Claimant's daycare, also completed a Functional Questionnaire Age 1-3 for Claimant. Tr. at 766-772. Ms. Hayslip largely echoed Ms. Bachman's opinion regarding Claimant's marked and extreme difficulties in the respective domains. Tr. at 767-769.  In addition, Ms. Hayslip wrote that Claimant understood, but refused to follow directions. Tr. at 767. Claimant was harsh with other children, but stood up for them if he was not the one hurting them. Tr. at 39, 768. He could perform the majority of day-to-day tasks if he wanted. Tr. at 38, 769. He was independent, but needed frequent attention and support. Tr. at 770. Ms. Hayslip also described Claimant as smart when he wanted to be Tr. at 771. His speech had improved Tr. at 772. Ms. Hayslip said that she could understand and communicate with Claimant much better over the preceding few months. Tr. at 772.

### III.    STEPS TO DETERMINE WHETHER CHILD IS ENTITLED TO SSI

In order to qualify for childhood SSI benefits, a claimant must show that he or she has a medically determinable physical or mental impairment which results in marked and severe functional limitations, and that is expected to cause death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 20 C.F.R. § 416.906.  An ALJ must proceed through the required sequential steps for evaluating entitlement to childhood SSI.  20 C.F.R. § 416.924(a).  The three-step procedure requires the ALJ to determine whether a child:

(1) is performing substantial gainful activity;

(2) has a "severe" impairment or combination of impairments; and

(3) whether the impairment or combination of impairments are of listing-level severity in that the impairment(s) either meets, medically equals or are the functional equivalent in severity to an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1 ("Listing");

20 C.F.R. § 416.924(a)-(d).  In order to *meet* a Listing, the child's impairment(s) must be substantiated by medical findings shown or described in the listing for that particular impairment.

-10-

20 C.F.R. § 416.925(d)(emphasis added.  In order to *medically equal* a Listing, a child's impairment(s) must be substantiated by medical findings at least equal in severity and duration to those shown or described in the listing for that particular impairment.  20 C.F.R. § 416.926(a) (emphasis added).  In order to *functionally equal* a Listing, the child's impairment(s) must be of listing-level severity; *i.e.*, it must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain.  20 C.F.R. § 416.926a(a)(emphasis added).  The Commissioner assesses all relevant factors, including:

> (1) how well the child initiates and sustains activities, how much extra help he needs, and the effects of structured or supportive settings;
>
> (2) how the child functions in school; and
>
> (3) how the child is affected by his medications or other treatment.

20 C.F.R. § 416.926a(a)(1)- (3).  Further, in considering whether a child's impairment functionally equals the Listings, the Commissioner begins by evaluating how a child functions on a daily basis and in all settings as compared to other children of the same age who do not have impairments.  20 C.F.R. § 416.926a(b).

The Commissioner considers how a child's functioning is affected during his activities at home, school and in his community in terms of six domains:

> (i) acquiring and using information;
>
> (ii) attending and completing tasks;
>
> (iii) interacting and relating with others;
>
> (iv) moving about and manipulating objects;
>
> (v) caring for yourself; and,
>
> (vi) health and physical well-being.

20 C.F.R. § 416.926a(b)(1)(i)-(vi).

Lengthy definitions for "marked" and "extreme" are set out in § 416.926a(e).  "Marked" limitation means a limitation that is "more than moderate" but "less than extreme."  It is the equivalent of the functioning expected on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.  See § 416.926a(e)(2)(i).  "Extreme" limitation

-11-

is the rating for the worst limitations.  However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function.  It is the equivalent of the functioning that would be expected on standardized testing with scores that are at least three standard deviations below the mean.  See 20 C.F.R § 416.926a(e) (3)(I).

An individual has a "marked" limitation when the impairment "interferes seriously with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i).  An "extreme" limitation exists when the impairment "interferes very seriously with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i).  An extreme limitation may also seriously limit day-to-day functioning. *Id.*

If the child's impairment meets, medically equals, or functionally equals the Listing, and if the impairment satisfies the Act's duration requirement, then the child is considered disabled.  20 C.F.R. § 416.924(d)(1). If both of these requirements are not satisfied, then the child is not considered disabled. 20 C.F.R. § 416.924(d)(2).

**IV.**	**STANDARD OF REVIEW**

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).  Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).  The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997).  Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *Richardson v. Perales*, 402 U.S. 389, 401 (1971.  It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *Id.*; *Walters,* 127 F.3d at 532. Substantiality is based upon the record taken as a whole. *Houston v. Sec'y of Health and Human Servs.*, 736 F.2d 365 (6th Cir. 1984).

-12-

## V.    RELEVANT PORTIONS OF THE ALJ'S DECISION

In concluding that Claimant was not disabled, the ALJ relied in large measure upon comments by treating sources and Plaintiff that Claimant's problems were controlled with medication, and that his outbursts lessened in severity and number when he was properly medicated. She further opined that behavior modification techniques, which had proven successful in the clinical setting, were not introduced at home because they did not result in a quick cessation of Claimant's tantrums.

With respect to the opinion of treating physician, Dr. Dass, who opined that Claimant had marked difficulties with interacting and relating to others and marked difficulty with attending and completing tasks, the ALJ concluded that the latter opinion was not supported by Dr. Dass' treating notes or the medical evidence in the record.  The ALJ, who gave little weight to Dr. Dass' opinion that Claimant has marked difficulty attending and completing tasks, observed:

> In fact, Dr .Dass' own treatment notes contradict his opinion with respect to this domain as he repeatedly found that [Claimant's] symptoms had improved since starting medication and [Claimant] was doing well.  There is no indication in Dr. Dass' treatment notes that [Claimant] engaged in self-injurious behavior once the home was childproofed.  In addition, Dr. Dass' opinion is conclusory and provides no explanation of the evidence relied on in forming that opinion.

Tr. at 35 (internal citations omitted).

The ALJ also gave little weight to the opinions of Ms. Crowe-Carpenter, the nurse practitioner, who concluded that Claimant had extreme difficulties in all the domains of childhood functioning, and Claimant's teachers, Ms. Hayslip and Ms. Bachman, who concluded that Claimant had marked and/or extreme difficulties in all but one of the domains of childhood functioning.  The ALJ recognized that Ms. Crowe-Carpenter was not an accepted medical source, and further concluded that all of the foregoing opinions were contradicted by the medical evidence in the record. The ALJ wrote:

> Again, [Claimant's] behavior and functioning in all domains has significantly improved since starting medication.  Treatment notes from Dr. Dass, Dr. Rizkala, Dr. While, and Ms. Scott [the speech therapist] all document [Claimant's] improved

-13-

behavior and symptoms and contradict the earlier opinions of Ms. Bachman and Ms. Hayslip."

Tr. at 36.

## VI.  ANALYSIS

### A.  Treating physician rule and opinion evidence

The undersigned will address Plaintiff's arguments out of sequence for ease of analysis. An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security.  Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson*, 378 F.3d at 544.  A presumption exists that the opinion of a treating physician is entitled to great deference.  *Id.*; *Rogers, supra*, at 243 (6th Cir. 2007.  If that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.

When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in determining the weight to give to that opinion:  the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.*

On the other hand, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' " *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013. The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling.  *Id.* citing  20 C.F.R. §404.1527(c. Other factors "which tend to support or contradict the opinion" may be considered in assessing any type of medical opinion.  *Id.* citing §404.1527(c)(6.

Finally, evidence from "other sources" may not be used to establish the existence of a medically determinable impairment or given controlling weight, however, the ALJ may use evidence

-14-

from "other sources" to demonstrate the severity of the claimant's impairments and how it affects the claimant's ability to function. 20 C.F.R. § 404.1513(d)(1); *Cruse v. Comm'r*, 502 F.3d 532, 541 (6th Cir.2007. "Other sources" include nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists. *Id.* When considering opinions from non-medical sources who have seen a plaintiff in a professional capacity, the ALJ should look to several factors, including the opinion's consistency with other evidence, how long the source has known the individual, and how well the source explained his opinion. *Winning v. Comm'r of Soc. Sec.*, 661 F.Supp.2d 807, 820 (N.D.Ohio 2009) (citing *Cruse, supra,* at 541.)

Plaintiff contends that the ALJ erred in giving only some weight to the opinion of Dr. Dass, and little weight to the opinions of Ms. Scott, Ms. Crowe-Carpenter, and Claimant's day-care providers, all of whom concluded that Claimant suffered marked or extreme difficulties in the various domains. The ALJ wrote that Dr. Dass' conclusions were contravened by his treatment notes. With respect to the opinions of Ms. Scott and the day-care providers, the ALJ gave their opinions little weight because they are not accepted medical sources and were not supported by the record.

The ALJ's assignment of weight to the various opinions was largely dependent on her conclusion that Claimant's problems were controlled with medication. Tr. 35-36. For example, on January 29, 2010, Dr. Rizkala noted that Clonipine provided temporary assistance with Claimant's behavioral outbursts and disruptive behavior. Tr. at 566. During Dr. Rizkala's examination, Claimant was calm, held still, established eye contact, and did not switch from one object to another. Tr. at 567. He focused when Dr. Rizkala asked him simple questions and he answered those questions with only some disarticulation . Tr. at 567.

On August 3, 2010, Dr. Dass wrote that Claimant's medication helped to calm and relax him. Tr. at 879. Claimant also cooperated and displayed good insight and judgment. Tr. at 881. Several months later, on December 30, 2010, Dr. Rizkala reported that since Claimant had been prescribed Risperdal, "his agitation and restlessness improved dramatically." Tr. at 794. Claimant had also made gains in his speech and could interact with his siblings and other children in the family. Tr. at 794. On examination, Claimant appeared to be in good spirits and had excellent eye contact. Tr. at 795.

-15-

On January 17, 2011, Dr. Dass noted that Risperdal, which had been restarted in November due to Claimant's increased aggression and severe tantrums, had been helpful.  Tr. at 877. Claimant again appeared cooperative and had good insight and judgment. Thereafter, on April 26, 2011, Dr. Dass noted that Claimant had been having tantrums and playing more aggressively since running out of Risperdal one month earlier. Tr. at 876. Nonetheless, at the examination, Claimant again cooperated and displayed good insight and judgment.  Risperdal was re-prescribed.

In addition to Claimant's documented improvement with medication, the other records cited by the ALJ also did not support the significant functional limitations set forth in the questionnaires. For example, on February 23, 2010, Ms. Scott, Claimant's speech language pathologist, observed him to initiate two-word phrases. Tr. at 888. She rated his receptive language skills as within range, and his expressive language skills as solid up to eighteen months with emerging skills up to twenty-one months. Tr. at  888. On April 6, 2010, Dr. White, Claimant's psychologist, concluded that Claimant exhibited the ability to somewhat adapt to the behavioral demands of his environment and successfully completed the tasks at hand. Tr. at 701.

A little more than one month later, Dr. White observed that although Claimant was wild and disruptive at the beginning of treatment, he improved greatly with the implementation of behavioral techniques. Tr. at 730. Moreover, Plaintiff noted that she had  developed strategies to improve his behavior. Tr. at 643. Specifically, when she allowed him to exercise in the yard, he became more compliant and less prone to tantrums. Tr. at 643. When she paid less attention to his negative behaviors, he was more likely to cease them. Tr. at 730.

Thereafter, on October 5, 2010, Ms. Scott noted that Claimant  "spontaneously used words and phrases to communicate in the clinic room." Tr. at 890. Nearly three months later, Dr. Rizkala wrote that Claimant "ha[d] been making gains in his speech" and had gained speech skills through early intervention assistance provided by his school. Tr. at 794, 796. Subsequently, on August 15, 2011, Ms. Flood, a certified nurse practitioner, reported that although difficult to understand, Claimant spoke in full sentences. Tr. at 830. Claimant named body parts, drew a person with five parts, identified colors and shapes, and recognized some letters. Tr. at 830.  At the time, Claimant's

father did not believe extra speech therapy outside of school was necessary, and Plaintiff declined a speech therapy referral. Tr. at 829-830.

Finally, in addition to being unsupported by and/or inconsistent with the other evidence of record, the ALJ explained that Dr. Dass' questionnaire was conclusory and provided no explanation about what evidence Dr. Dass relied on to complete it. Tr. at 834-840. See 20 C.F.R. § 416.927(c)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion"). Regarding the questionnaires completed by Ms. Crowe-Carpenter, Ms. Bachman and Ms. Hayslip, the ALJ reasonably considered their status as a not acceptable medical sources as a factor in her analysis. See SSR 06-03p, 2006 WL 2329939, at *5 (stating that the fact that an opinion is from an acceptable medical source may justify giving it more weight than an opinion from a not acceptable medical source). Consequently, for all of these reasons, the undersigned recommends that the Court find that the ALJ properly evaluated all of the opinion evidence and did not violate the treating physician rule.

### B.    Step three analysis

The burden of proof at step three of the sequential entitlement to children's social security benefits rests with Plaintiff. *Franklin ex rel. L.F. v. Comm'r of Soc. Sec.*, No. 4:10CV2215, 2012 WL 727799, at *1 (N.D. Ohio Feb. 16, 2012), citing *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999. The ALJ must "nevertheless provide articulation of step three findings that will permit meaningful review of those findings." *Franklin*, citing *Bledsoe v. Barnhart*, 165 Fed. App'x 408, 411 (6th Cir. 2006) and *Hunter v. Comm'r of Soc. Sec.*, No. 1:09CV2790, 2011 WL 6440762, at *3-4 (N.D. Ohio Dec. 20, 2011. "As a rule, the ALJ must build an accurate and logical bridge between the evidence and his conclusion." *Hernandez ex rel. L.A. v. Astrue*, No. 1:10CV1295, 2011 WL 4899960, at *6, citing *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011); *see also Wilson v. Comm'r of Soc.* Sec., 378 F.3d 541, 544-546 (6th Cir. 2004.

In *Reynolds v. Commissioner of Social Security*, 424 Fed. App'x 411 (6th Cir. 2011), the Sixth Circuit Court of Appeals reversed and remanded the case when the ALJ found that the claimant had severe physical and mental impairments at step two of the sequential analysis but failed to analyze the claimant's back impairment at step three despite concluding that his back impairment had failed

-17-

to meet or equal a Listing.  The Sixth Circuit noted that while the ALJ had thoroughly addressed the claimant's severe mental impairments in his step three analysis, " '[n]o analysis whatsoever was done as to whether Reynolds' physical impairments (all summed up in his finding of a severe 'back pain' impairment) met or equaled a Listing under section 1.00, despite his introduction concluding that they did not." *Id.* at 415.  The Sixth Circuit found that:

> In short, the ALJ needed to actually evaluate the evidence, compare it to Section 1.00 of the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review.  Without it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence.

*Id.* at 416 [citations omitted].

Courts within this District have applied *Reynolds* and vacated and remanded cases where the ALJ provided only a conclusory statement and failed to conduct a meaningful step three analysis that compares the medical evidence to the applicable listing and provides an "explained conclusion" as to why a claimant's impairments failed to meet or equal a Listing.  *See e.g., Saleh v. Comm'r of Soc. Sec.,* 2013 WL 3421835, at *8 (N.D. Ohio July 8, 2013); *Waller v. Astrue,* 2012 WL 6771844 at *2–5 (N.D.Ohio Dec.7, 2012) *adopted,* 2013 WL 57046 (N.D.Ohio Jan.3, 2013); *May v. Astrue,* 2011 WL 3490186 at *7–10 (N.D.Ohio June 1, 2011) *adopted,* 2011 WL 3490229 (N.D.Ohio Aug.10, 2011); *Keyes v. Astrue,* 2012 WL 832576 at *5–6 (N.D.Ohio March 12, 2012); *Hunter v. Astrue*, 2011 WL 6440762 at *3–4 (N.D.Ohio Dec.20, 2011); *Marok v. Astrue,* 2010 WL 2294056 at *5 (N.D.Ohio June 3, 2010); *Hakkarainen v. Astrue*, 2012 WL 398595 at *10–13 (N.D.Ohio Jan.19, 2012) *adopted* 2012 WL 396970 (N.D.Ohio Feb.7, 2012); *Shea v. Astrue,* 2012 WL 967088 at *8–11 (N.D.Ohio Feb.13, 2012) *adopted* 2012 WL 967072 (N.D.Ohio March 21, 2012.  While no heightened articulation at step three is required, an ALJ must nevertheless articulate findings that will permit meaningful judicial review of his findings.  *Hunter v. Comm'r of Soc. Sec*., No. 1:09CV2790, 2011 WL 6440762, at *3-4 (N.D. Ohio Dec. 20, 2011.

The ALJ concluded that Claimant does not have an impairment that meets or medically equals Listing 112.11, 112.04, 112.08, or 102.10B3.  Listing 112.11, captioned "Attention Deficit Hyperactivity Disorder: Manifested by developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity," reads, in its entirety:

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

   A. Medically documented findings of all three of the following:

      1. Marked inattention; and

      2. Marked impulsiveness; and

      3. Marked hyperactivity;

      and

   B. For older infants and toddlers (age 1 to attainment of age 3), resulting in at least one of the appropriate age-group criteria in paragraph B1 of 112.02; or, for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.

Listing 112.04, captioned "Mood Disorders," reads, in its entirety:

112.04 Mood Disorders: Characterized by a disturbance of mood (referring to a prolonged emotion that colors the whole psychic life, generally involving either depression or elation), accompanied by a full or partial manic or depressive syndrome.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:

1. Major depressive syndrome, characterized by at least five of the following, which must include either depressed or irritable mood or markedly diminished interest or pleasure:

   a. Depressed or irritable mood; or

   b. Markedly diminished interest or pleasure in almost all activities; or

   c. Appetite or weight increase or decrease, or failure to make expected weight gains; or

   d. Sleep disturbance; or

   e. Psychomotor agitation or retardation; or

   f. Fatigue or loss of energy; or

   g. Feelings of worthlessness or guilt; or

   h. Difficulty thinking or concentrating; or

   i. Suicidal thoughts or acts; or

-19-

j. Hallucinations, delusions, or paranoid thinking;

or

2. Manic syndrome, characterized by elevated, expansive, or irritable mood, and at least three of the following:

a. Increased activity or psychomotor agitation; or

b. Increased talkativeness or pressure of speech; or

c. Flight of ideas or subjectively experienced racing thoughts; or

d. Inflated self-esteem or grandiosity; or

e. Decreased need for sleep; or

f. Easy distractibility; or

g. Involvement in activities that have a high potential of painful consequences which are not recognized; or

h. Hallucinations, delusions, or paranoid thinking;

or

3. Bipolar or cyclothymic syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently or most recently characterized by the full or partial symptomatic picture of either or both syndromes);

and

B. For older infants and toddlers (age 1 to attainment of age 3), resulting in at least one of the appropriate age-group criteria in paragraph B1 of 112.02; or, for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.

Listing 112.08, captioned "Personality Disorders: Manifested by pervasive, inflexible, and maladaptive personality traits, which are typical of the child's long-term functioning and not limited to discrete episodes of illness," reads, in its entirety:

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

A. Deeply ingrained, maladaptive patterns of behavior, associated with one of the following:

1. Seclusiveness or autistic thinking; or

2. Pathologically inappropriate suspiciousness or hostility; or

-20-

3. Oddities of thought, perception, speech, and behavior; or

4. Persistent disturbances of mood or affect; or

5. Pathological dependence, passivity, or aggressiveness; or

6. Intense and unstable interpersonal relationships and impulsive and exploitative behavior; or

7. Pathological perfectionism and inflexibility;

and

B. For older infants and toddlers (age 1 to attainment of age 3), resulting in at least one of the appropriate age-group criteria in paragraph B1 of 112.02; or, for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.

The relevant sections of Listing 112.02, captioned "Organic Mental Disorders," read, in their

entirety:

B. Select the appropriate age group to evaluate the severity of the impairment:

1. For older infants and toddlers (age 1 to attainment of age 3), resulting in at least one of the following:

a. Gross or fine motor development at a level generally acquired by children no more than one-half the child's chronological age, documented by:

(1) An appropriate standardized test; or

(2) Other medical findings (see 112.00C); or

b. Cognitive/communicative function at a level generally acquired by children no more than one-half the child's chronological age, documented by:

(1) An appropriate standardized test; or

(2) Other medical findings of equivalent cognitive/communicative abnormality, such as the inability to use simple verbal or nonverbal behavior to communicate basic needs or concepts; or

c. Social function at a level generally acquired by children no more than one-half the child's chronological age, documented by:

(1) An appropriate standardized test; or

-21-

(2) Other medical findings of an equivalent abnormality of social functioning, exemplified by serious inability to achieve age-appropriate autonomy as manifested by excessive clinging or extreme separation anxiety; or

d. Attainment of development or function generally acquired by children no more than two-thirds of the child's chronological age in two or more areas covered by a., b., or c., as measured by an appropriate standardized test or other appropriate medical findings.

2. For children (age 3 to attainment of age 18), resulting in at least two of the following:

a. Marked impairment in age-appropriate cognitive/ communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or

b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

d. Marked difficulties in maintaining concentration, persistence, or pace.

Finally, section B3 of Listing 102.10, captioned "Hearing Loss not treated with cochlear implantation," reads, in its entirety:

A. For children from birth to the attainment of age 5, an average air conduction hearing threshold of 50 decibels or greater in the better ear (see 102.00B2).

OR

-22-

B . For children from age 5 to the attainment of age 18:

1. An average air conduction hearing threshold of 70 decibels or greater in the better ear and an average bone conduction hearing threshold of 40 decibels or greater in the better ear (see 102.00B2f); or

2. A word recognition score of 40 percent or less in the better ear determined using a standardized list of phonetically balanced monosyllabic words (see 102.00B2f); or

3. An average air conduction hearing threshold of 50 decibels or greater in the better ear and a marked limitation in speech or language (see 102.00B2f and 102.00B5).

The ALJ observed that the record does not contain any evidence that Claimant suffers any marked inattention, impulsiveness, or hyperactivity as required for Listing 112.11. Likewise, the ALJ concluded that Claimant's ODD and disruptive behavior disorder are not manifested by pervasive, inflexible, and maladaptive personality traits typical of Claimant's long term functioning. Furthermore, the ALJ concluded that the evidence does not indicate that Claimant has a disturbance of mood, which colors his whole psychic life accompanied by a full or partial manic or depressive syndrome. Finally, the ALJ concluded that the evidence in the record does not establish that Claimant's Broca's dysphasia and expressive language disorder cause a marked limitation in Claimant's speech.

Although the ALJ addressed whether Claimant's limitations met each of the foregoing Listings individually, she offered no analysis with respect to the combination of Claimant's impairments and whether his impairments in combination medically equal one or more of the Listings. The ALJ did address Claimant's impairments in combination in her functional equivalence analysis, however, several cases in this Circuit hold that an ALJ's functional equivalence analysis does not suffice to substitute for the step three meets or equals analysis. *See M.G. v. Comm'r of Soc. Sec.,* 861 F.Supp.2d 846, 859, n.6 (E.D. Mich. 2012)(collecting cases); *Evans ex rel. DCB v. Comm'r of Soc. Sec*., No. 11-cv-11862, 2012 WL 3112415, at *9 (E.D. Mich., Mar. 21, 2012), unpublished (collecting cases). Accordingly, the undersigned recommends that the Court find that the ALJ's functional equivalence analysis in this case does not provide an adequate substitute for the step three meets or equals analysis.

However, an ALJ's failure to explain how she reached her step three meets or equals conclusion can constitute harmless error where the review of the decision as a whole leads to the

-23-

conclusion that no reasonable fact finder, following the correct procedure, could have resolved the factual matter in another manner. *See Hufstetler v. Comm'r of Soc. Sec.*, No. 1:10CV1196, 2011 WL 2461339, at \*10 (N.D. Ohio June 17, 2011.

Unlike the ALJ in *Reynolds,* the ALJ in this case considered each of the Listings individually and concluded that Claimant's impairments neither met or equaled the various Listings.  She applied each of the standards to the medical evidence in the case. However, the ALJ concluded that medical evidence in the record did not support the dire opinions of the various treating sources, since Claimant responded well to his prescribed medication and was receptive to behavior modification techniques.  She also relied upon evidence in the record to conclude that Plaintiff failed to provide medication to Claimant on a sustained basis, and  also failed to undertake the recommended behavior medication techniques because they did not quickly assuage Claimant's tantrums.  Accordingly, the undersigned recommends that the Court find that, although the ALJ did not conduct a proper step three analysis, her failure to do so constituted harmless error, and Plaintiff's argument predicated upon the Listings is not well taken.

## VII.   CONCLUSION

For the foregoing reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and DISMISS the instant case with prejudice.

**IT IS SO ORDERED**.

DATE: October 15, 2014                           ___*/s/George J. Limbert*_____
                                                 GEORGE J. LIMBERT
                                                 UNITED STATES MAGISTRATE JUDGE

-24-